DURBROW & HEARNE MANUFACTURING CO. *v.* UNITED STATES (No. 1957).[1]

1. CONSTRUCTION, PARAGRAPHS 165 AND 441, TARIFF ACT OF 1913—"EMBROIDERY MACHINES"—"SEWING MACHINES."

A machine that is primarily constructed and designed for sewing fabrics is still a sewing machine although used for the purpose of embroidery work; and, on the other hand, a machine primarily constructed and designed to do embroidering would remain such, even assuming that it might be used for ordinary machine sewing.  The provision of paragraph 165, tariff act of 1913, for "embroidery machines" and that of paragraph 441 for "sewing machines" will be so construed. The question is not so much what the machine does as what it was primarily constructed and designed to do.

2. EMBROIDERY—MACHINE STITCHING.

Stitching done by an ordinary sewing machine may at any time rise to the standard of embroidery if it is employed for the purpose of producing and does in fact produce a designedly ornamental result upon a given fabric.

3. EVIDENCE—JUDICIAL KNOWLEDGE—SEWING-MACHINE ATTACHMENTS.

It is common knowledge that the ordinary domestic sewing machine has attachments which are sold with the machine at the option of the purchaser which are adapted and designed and when applied enable such machines to produce embroidery.

---

[1] T. D. 37993 (36 Treas. Dec., 370).

4. CONSTRUCTION, PARAGRAPH 165, TARIFF ACT OF 1913—"EMBROIDERY MACHINES.'

The provision of paragraph 165, tariff act of 1913, for "embroidery machines" refers to a class of machines which is imported, designed, constructed, and adapted for embroidering only.

5. SEWING MACHINES USED FOR EMBROIDERING.

A sewing machine imported for use in embroidering, and for that reason lacking the presser foot and feed as being unnecessary, this lack making no change in the stitch made by the machine, is still a sewing machine, entitled to free entry as such, or part of such, under paragraph 441, tariff act of 1913, and not dutiable as an embroidery machine under paragraph 165.

United States Court of Customs Appeals, April 15, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8212 (T. D. 37830).

[Reversed.]

B. A. Levett for appellant.

Bert Hanson, Assistant Attorney General (Martin T. Baldwin, special attorney, of counsel), for the United States.

[Oral argument Mar. 26, 1919, by Mr. Levett and Mr. Baldwin.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

Paragraph 441 of the tariff act of 1913 extends the favor of free entry to "sewing machines * * * whether imported in whole or in parts, including repair parts." Paragraph 165 provides for a duty of 25 per cent ad valorem upon "embroidering machines" and the main question here is under which of these two paragraphs certain machines hereinafter described are to be classified.

The importer claims under paragraph 441 and alternatively under paragraph 167, providing for articles composed wholly or in chief value of steel or other metal, but in view of the conclusion we reach it becomes unnecessary to consider the alternative claim.

It seems that prior to 1909 neither sewing machines nor embroidering machines were eo nomine provided for in the tariff statutes. Theretofore they had apparently been classifiable under appropriate provisions as manufactures of metal. Paragraph 197 of the act of 1909 provided for a duty of 30 per cent ad valorem upon sewing machines and of 45 per cent ad valorem on embroidery machines and also that embroidery machines imported prior to January 1, 1911, should be given free entry. No eo nomine provision was made therein for parts of either of such machines.

The importations here came from Germany in April, 1916, and were entered at the port of New York in June of the same year. The entry paper refers to the merchandise as "ten cases sewing machines." Upon the invoice they are described as follows: (a) "3 heads Adler sewing-machine class 8–8 for embroidering without arrangement for sewing"; (b) "2 heads Adler sewing machine class 8–9 with patent arrangement for sewing, embroidering, and darning"; (c) "2 heads

Adler sewing machine class 9–4, semiautomatic embroidery machine for padstitch, only for power"; (d) "3 heads Adler sewing machine class 9–2, semiautomatic embroidery machines for zigzag, only for power."

The machines described as class 8–8 were classified as embroidering machines under paragraph 165 above mentioned. The printed record before us shows that class 8–9 was given free entry as sewing machines and, as we understand the entries upon the invoice, the same favor was accorded to the balance of the importation.

The only question is as to the proper classification of the 8–8 machines. The official exhibit which is before us is a sample of the 8–9 machine.

A member of the importing company who was called by the importer was the only witness before the board. In substance he testified that the only difference between the 8–8 and the 8–9 machines was that the feed mechanism and presser foot were not on the 8–8 machine, but were on the 8–9; that the removal of these two attachments from an 8–9 machine immediately and with no other change converted it into an 8–8 machine; that the 8–9 was an ordinary sewing machine; that the 8–8 was ordered and imported without the presser foot and feed attachment as a matter of economy, enabling them to sell the machine more cheaply than they could if those parts were with it; that in the general conduct of importer's business they sold these two machines indifferently according to the demands of the trade, some users desiring the presser foot and feed apparatus, others not; that the 8–8 was really a part of a complete 8–9 machine; that the feed mechanism and presser foot were originally a part of the machine. He also gave the following testimony with reference to these parts:

In the use for which this machine is generally sold it is unnecessary to have this feed mechanism or presser foot. When the work is done, the operator stretches the goods in a frame known as an embroidery frame, and as the feed mechanism and presser foot is not necessary, as a matter of economy the machines are imported without those parts. The operators do not need them. They move the goods around by hand.

Q. Is the stitch exactly the same?—A. Yes, sir; absolutely the same; the only difference is these parts were taken off because they are not used.

It is not suggested that this testimony does not state the facts.

The Board of General Appraisers held the 8–8 machines classifiable under paragraph 165 as embroidering machines upon the theory that inasmuch as in the condition imported they were suitable for embroidering only, they must be regarded as embroidering machines. As to whether they might not be regarded as parts of sewing machines, the board said nothing in its opinion.

The importer concedes here that the 8–8 machines were imported to be used in embroidering, but it contends that a sewing machine does not become an embroidering machine merely because of its

adaptibility to embroidering, citing G. A. 7582 (T. D. 34607). This was a case involving the interpretation of paragraph 197 of the act of 1909. The machines there had been invoiced as embroidery machines, assessed as such under paragraph 197, but claimed to be dutiable by the importers as sewing machines. No precise description of the article is contained in the board's opinion. It appeared that while the free-entry provision for embroidery machines of paragraph 197 was in force identical machines had been given free entry upon the representation of the importers that they were embroidery machines; that upon the expiration of the free-entry period the importers then claimed they should be classified as sewing machines. This the board refused to permit and sustained the classification. Discussing the question the board said:

Whether a sewing machine is an embroidery machine, or vice versa, must be determined by a knowledge of the character of the construction of its mechanism and of the primary purpose for which it was designed. It is a matter of common knowledge that a great number, if not all, of the various types of sewing machines, by the manipulation or adjustment of one or more of their attachments, may be rendered competent to perform fancy stitching or embroidered work. But such an extraordinary, exceptional, or unusual use to which such a machine might possibly be made adaptable could hardly serve as a potent factor in determining its commercial or dutiable status. The fact remains that it is a machine primarily constructed and designed for sewing fabrics—a sewing machine—and any other use thereof is purely incidental and devised merely to meet some household emergency. Such a sewing machine would be wholly inadequate to do the work for which the embroidery machine in trade and commerce is specially constructed and designed. As sewing machines are specially constructed and primarily intended to sew fabrics, so, also, is it the chief function of embroidery machines to stitch upon fabrics and other articles various forms of fancy and embroidered needlework.

The Standard Dictionary defines a sewing machine as "a machine for sewing; a machine for stitching ordinary fabrics." And in Knight's Mechanical Dictionary is given the following definition of an embroidery machine:

A form of sewing machine in which the cloth is moved beneath the reciprocating needle bar according to the requirements of the tracing while the needles and hooks retain their respective relative positions above and below the fabrics.

While it is true that each of the machines here under discussion bears a striking similarity in use to a sewing machine, in that both classes of machines employ needles and thread and are capable of sewing fabrics, nevertheless the proof here submitted clearly establishes the fact that these particular machines were primarily constructed and intended to do all kinds of festooning and embroidery work, and that they were advertised and sold by protestants as and under the name of embroidery machines.

As already stated, all machines operating needle and thread are species of sewing machines, just as embroidery machines, as defined by Knight, are forms of sewing machines, but the latter may be distinguished from the former class by reason of its construction and the primary design of its manufacturer as to its principal function or use.

We have quoted thus at length from the opinion of the board because in our view the language is well chosen to express the true rule of distinction between embroidering and sewing machines.

A machine that is primarily constructed and designed for sewing fabrics is still a sewing machine although used for the purpose of

embroidery work, and, on the other hand, a machine primarily constructed and designed to do embroidering remains such, even assuming, although we do not understand that it is so, that it might be used for ordinary machine sewing. The question is not so much what it does as what it primarily was constructed and designed to do.

In this connection reference may be had to Abstract 30720 (T. D. 33018).

We also note that representations were made to the committee having charge of the preparation of the tariff act of 1913 touching these two classes of machines, and among other things it was stated that one domestic concern had invested over $230,000 in trying to manufacture embroidery machines in this country, which so far had not proven financially successful, and that if protection were afforded to that industry it was anticipated a profitable business might be done in the manufacture of such machines, profitable not only to the manufacturers thereof but especially so to the domestic embroidery industry. Some, if not all, of the embroidery machines mentioned were multiple-needle machines. It was stated that laces and embroideries were sometimes produced upon the same machine; that the manufacture of embroidery machines was practically the only thing left in this line for a new industry; and that there were a greater number of embroidery machines used abroad than in this country owing to the ownership and control of certain patents relating to embroidery machines. We do not find in any of these statements any suggestion that embroidery machines were used for sewing machine purposes or vice versa. See volume 4 of the hearings before the Committee on Ways and Means (pp. 3855, 3856, 3857, 3867, 3868, 3869, 3893–4–5, 3897–8, 3905, 3913, 3921).

Upon the record in the case now before us we do not think it can be said that these 8–8 machines were primarily constructed and designed for embroidery work. Judging from the exhibit before us, they are one-needle machines. With the presser foot and feed attachment they are capable of performing and manifestly constructed to perform the work of an ordinary sewing machine. With these attachments left off they make exactly the same stitch as when the attachments are employed, the only difference in their work being, as said by the witness, that the fabric to be operated upon is moved around by hand.

Without desiring to indulge in any discussion as to what is or is not embroidery, we note that it has been the subject of extended litigation. In G. A. 6205 (T. D. 26853), the board, by De Vries, General Appraiser, held that embroidery was "some ornamentation of a fabric by means of an aggregation of one or more kinds of stitches in pursuance of some design, the purpose of which is for ornamentation," and again the same general appraiser, in a dissenting opinion

in G. A. 6589 (T. D. 28170), reached a like conclusion. The view set forth in the dissenting opinion seems to have been ultimately sustained by the Circuit Court of Appeals. See Woodruff & Co. *v.* United States (2 Ct. Cust. Appls., 186; T. D. 31942); also Sloane *v.* United States (7 Ct. Cust. Appls., 463; T. D. 37049).

These authorities establish, and we think the fact is undeniably so, that stitching done by an ordinary sewing machine may at any time rise to the standard of embroidery if it is employed for the purpose of producing and does in fact produce a designedly ornamental result upon a given fabric. And it is, we think, common knowledge that the ordinary domestic sewing machine has attachments which are sold with the machine at the option of the purchaser which are adapted and designed and when applied enable such machines to produce embroidery, but we do not think in providing for embroidering machines under paragraph 165 Congress intended to include such machines. In other words, it did not intend to let the classification of that class of machines depend upon the incident of importation with or without the sewing attachments or embroidery attachments, as the case might be.

Upon the argument of the case in this court it was orally conceded by the Government that there is a class of embroidering machines imported that are designed, constructed, and adapted for embroidering only and manifestly Congress so understood when it made an eo nomine provision for such articles. It made no express provision for parts of such machines, but did provide that sewing machines, whether imported in whole or in parts, including repair parts, should be given free entry.

The recited evidence seems to warrant the conclusion that this 8–8 machine may be regarded as a part of a complete sewing machine such as 8–9. For the purposes of this case, however, it is unnecessary to decide whether the importation in question is entitled to free entry as a sewing machine or as a part thereof. As one or the other we think it is so entitled.

If in view of the similarity in the mechanical construction of sewing and embroidery machines it can be said that there is a fair doubt as to which of the competing paragraphs more closely describes those here involved, the importer is entitled to the benefit of that doubt.

The judgment of the Board of General Appraisers is *reversed*.